[No. D054369. Fourth Dist., Div. One. July 15, 2010.]

REGINALD NELSON, Plaintiff and Appellant, v.
PEARSON FORD CO., Defendant and Appellant.

984

## COUNSEL

Rosner, Barry & Babbitt, Hallen D. Rosner and Christopher P. Barry for Plaintiff and Appellant.

Horvitz & Levy, Lisa Perrochet, S. Thomas Todd, Bradley Scott Pauley; Tharpe & Howell, Christopher S. Maile, Soojin Kang; Geller & Stewart and Michael S. Geller for Defendant and Appellant.

Manning, Leaver, Bruder & Berberich and Halbert B. Rasmussen for California New Car Dealers Association as Amicus Curiae on behalf of Defendant and Appellant.

OPINION

McINTYRE, J.—In this case, Pearson Ford Co., an automobile dealer, backdated a contract it had entered into with Reginald Nelson, the vehicle buyer. Backdating the contract rendered inaccurate the disclosed annual percentage rate (APR), and resulted in Nelson paying interest for a time period that no contract existed. Pearson Ford also failed to list in the contract Nelson's purchase of automobile liability insurance, and erroneously added the insurance premium to the sales price of the vehicle.

Nelson sued Pearson Ford alleging violations of the Automobile Sales Finance Act (ASFA) (Civ. Code, § 2981 et seq.), California's unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.), and the Consumers Legal Remedies Act (CLRA) (Civ. Code, § 1750 et seq.). (All undesignated statutory references are to the Civil Code.) The trial court certified the matter as a class action, with two classes: the backdating class and the insurance class. After a bench trial, the trial court found Pearson Ford not liable under the ASFA to the backdating class, but liable under the ASFA to the insurance class. It also found Pearson Ford liable to both classes under the UCL, but not the CLRA. The trial court issued certain remedies under the ASFA and the UCL, and awarded Nelson his attorney fees and costs under the ASFA. Both parties appeal.

Nelson asserts the trial court erred in finding Pearson Ford not liable to the backdating class under the ASFA, and not liable under the CLRA. Nelson also contends the trial court erred in the remedies it awarded under the UCL. On cross-appeal, Pearson Ford asserts it complied with the ASFA as to both classes, the class representative (Nelson) lacked standing under the UCL, and the trial court erred in the remedies it awarded under the ASFA and the UCL. Pearson Ford also contends the trial court erred in finding the Code of Civil Procedure section 998 offer it made to Nelson invalid; accordingly, it asserts that the attorney fee and costs award should be reversed.

We conclude that the portion of the judgment finding Pearson Ford not liable to the backdating class under the ASFA and the CLRA must be reversed. We agree with Pearson Ford that the trial court erred in the remedies it awarded under the ASFA and the UCL, and that the court erred in issuing a permanent injunction under the UCL as to the insurance class. We agree with Nelson that the portion of the judgment returning to Pearson Ford any sums remaining after the payment of all valid claims must be reversed, and direct the trial court to comply with Code of Civil Procedure section 384 as to both classes. We remand the matter to determine, consistent with the views expressed in this opinion, appropriate statutory remedies for both classes under the ASFA; the insurance class under the ASFA and the UCL;

and the backdating class under the CLRA. Finally, we agree with the trial court's conclusion regarding the invalidity of Pearson Ford's Code of Civil Procedure section 998 offer.

## FACTUAL AND PROCEDURAL BACKGROUND

Nelson agreed to purchase a used 1998 Infiniti 130 (the car) from Pearson Ford for $9,995. On October 2, 2004, Nelson submitted a credit application, and Pearson Ford prepared a conditional sale or retail installment sale contract (the original contract) for Nelson's signature. (All undesignated dates are in 2004.) That same day, Nelson signed the original contract and took possession of the car. Under the original contract, Pearson Ford had the right to rescind the transaction within 10 days if it could not sell Nelson's loan to an institutional lender.

At the time of the purchase, Nelson did not have automobile insurance. Pearson Ford contacted an insurance broker who came to the dealership to sell Nelson an insurance policy. Nelson signed a "Due Bill" stating that he agreed to purchase the insurance for $250, and that the price of the insurance was "included in the total price of $10,245.00 as shown on line 1(A) of my contract."

On October 8, Pearson Ford called Nelson and asked him to return to the dealership to fill out more paperwork, which Nelson did the same day. Nelson signed an "Acknowledgment of Rewritten Contract" (Acknowledgment) stating that the original contract date was October 2, but that "the original contract . . . has been mutually rescinded and no longer has any legal effect," and the rewritten contract date was October 8. The Acknowledgment stated that, under the rewritten contract, the term of the loan, the monthly payment, and the total finance charges had changed in a certain amount. The Acknowledgment also stated: "I understand I am entitled to a complete refund of all consideration previously paid by me . . ." and "I hereby freely and voluntarily elect to enter into a different contract for the purchase of the vehicle . . . ."

On October 8, plaintiff signed a second retail installment sale contract (the second contract) consistent with the agreed-upon terms listed in the Acknowledgement. The parties backdated the second contract to October 2, the date they signed the original contract.

The original contract and the second contract listed the APR as 21 percent. However, interest started accruing on the second contract on October 2, six days before the parties signed it. This made the 21 percent APR listed in the second contract inaccurate. Because the parties signed the second contract on October 8, this decreased the actual number of days to the first payment due

date from 45 to 39 days, making the correct APR 21.23 percent. The interest for those six days (Oct. 2–8) was $19.53, and the interest over the 36-month loan period on that figure was $7.47. Thus, Nelson paid an additional $27 finance charge. The second contract disclosed the total finance charge as $2,082.36, which included the $27, but the $27 was not separately itemized.

Additionally, both contracts improperly added the $250 insurance premium to the cash price of the car. This mistake caused Nelson to erroneously pay $30 in additional sales tax and financing charges on the insurance premium.

On March 2, 2007, Nelson filed this class action alleging that Pearson Ford violated the ASFA, the UCL, and the CLRA as to two classes of individuals. Class 1 (the backdating class) consisted of: "All persons who between March 2, 2003, and March 27, 2008, (1) purchased a vehicle from Pearson Ford Co. for personal use, and (2) on a later date executed an Acknowledgment of Rewritten Contract, and (3) signed a subsequent or second contract for the purchase of the same vehicle, which contract was dated the date of the original purchase contract and involved financing at an annual percentage rate greater than 0.00%." Class 1 had about 1,500 members. Class 2 (the insurance class) consisted of: "All persons who between March 2, 2003, and March 27, 2008, executed a Retail Installment Sale Contract with Pearson Ford Co. that included in the 'Cash Price of Motor Vehicle' on Line 1.A.1 of the contract the cost of insurance." Class 2 had about nine members.

On the first day of trial, the parties agreed there were no triable issues of material fact. Accordingly, the court indicated it would revisit previously filed motions for summary judgment or adjudication. The parties then tried this matter to the court based on certain stipulated documents and facts. The court ultimately concluded that there were no triable issues of material fact.

The trial court entered judgment finding no violation of the CLRA. Although it found a "technical violation" of the ASFA as to the backdating class, it determined that Pearson Ford substantially complied with the ASFA, and denied any relief to the backdating class under the ASFA. Nevertheless, the court found Pearson Ford liable to the backdating class under the UCL, granted injunctive relief and set restitution in the amount of $50 per class member. For the insurance class, the court found that Pearson Ford violated the ASFA and the UCL by failing to disclose the cost of insurance and adding the insurance cost to the cash price of the car. It also enjoined Pearson Ford from adding the price of insurance to the cash price of a vehicle in the future. Both parties appealed. The trial court granted Nelson's motion for attorney fees and costs in the amount of $368,418.50 and $8,453, respectively. It denied Pearson Ford's motion for attorney fees and costs. The trial court later granted Nelson additional attorney fees and costs in the amount of

$21,144.50 and $3,342.60, respectively. Pearson Ford also appeals those orders. We granted the application of the California New Car Dealers Association to file an amicus curiae brief on behalf of Pearson Ford.

## DISCUSSION

We address the appeals simultaneously because they present intertwined arguments regarding liability under the ASFA, the UCL, and the CLRA. We separately discuss the federal Truth in Lending Act (TILA; 15 U.S.C. § 1601 et seq.) as this legislation serves as a backdrop for liability under the ASFA.

The parties do not contest the trial court's conclusion that there were no triable issues of material fact; rather, they dispute the trial court's application of the various statutes to the facts. We independently review the interpretation of the governing statutes, and application of the statutes to the undisputed facts. (*City of Saratoga v. Hinz* (2004) 115 Cal.App.4th 1202, 1212 [9 Cal.Rptr.3d 791].)

### I. *The TILA*

The purpose of the TILA is to assure consumers a meaningful disclosure of credit provisions, enabling the consumer to compare more readily various available credit terms and to avoid the uninformed use of credit. (*Mourning v. Family Publications Service, Inc.* (1973) 411 U.S. 356, 364 [36 L.Ed.2d 318, 93 S.Ct. 1652].) To effectuate its purposes, the TILA delegated broad regulatory and rulemaking power to the Federal Reserve Board. (15 U.S.C. §§ 1602(a), 1604; see *Bone v. Hibernia Bank* (9th Cir. 1974) 493 F.2d 135, 138.) Acting under this authority, the Federal Reserve Board issued "Regulation Z." (12 C.F.R. § 226.1 et seq. (2010).) Courts have strictly enforced the requirements of the TILA and those of Regulation Z to promote the TILA's purpose of protecting consumers. (*Fairley v. Turan-Foley Imports, Inc.* (5th Cir. 1995) 65 F.3d 475, 479–480.)

The TILA requires a lender to disclose, among other things, the amount financed, the finance charge, and the APR. (15 U.S.C. § 1638.) In turn, Regulation Z sets out certain guidelines for creditors to follow when disclosing this information to the consumer. (12 C.F.R. §§ 226.18, 226.22 (2010).) Regulation Z defines the APR as "a measure of the cost of credit, expressed as a yearly rate, that relates the amount and timing of value received by the consumer to the amount and timing of payments made." (12 C.F.R. § 226.22(a)(1) (2010).) As "the single most useful disclosure mandated by the Act," the APR "is a derived figure, calculated from (i) the amount of the finance charge, (ii) the amount of credit extended, and (iii) the term of the extension of credit—the time period between the date interest

starts accruing and the date of the last payment." (*Krenisky v. Rollins Protective Services Co.* (2d Cir. 1984) 728 F.2d 64, 66 (*Krenisky*).) Under the TILA and Regulation Z, the disclosed APR must be accurate to within 0.125 percent of the properly calculated APR. (15 U.S.C. § 1606(c); 12 C.F.R. § 226.22(a)(2) (2010).)

The time between the date the contract takes effect and the first payment is called "the first period." (12 C.F.R. § 226.17(c)(4) (2010).) As the *Krenisky* court explained, changing the length of the first period alters the APR: "If the transaction date and the accrual date do not coincide, the effective interest rate will be lower than the rate derived from the transaction date if the accrual date is later, and higher if the accrual date is earlier. If two creditors claim to be charging identical annual rates but one commences accruing finance charges months prior to the date of the transaction, he charges a higher effective annual rate although the disclosed rates are identical." (*Krenisky, supra,* 728 F.2d at p. 66.) When calculating the APR under Regulation Z, "[t]he term of the transaction begins on the date of its consummation, except that if the finance charge or any portion of it is earned beginning on a later date, the term begins on the later date." (12 C.F.R. § 226, appen. J(B)(2) (2010).) Consummation is defined as "the time that a consumer becomes contractually obligated on a credit transaction." (12 C.F.R. § 226.2(a)(13) (2010).) Several courts have decided that accrual dates prior to the date of consummation are prohibited. (*Krenisky, supra,* 728 F.2d at p. 67, fn. 3; *Rucker v. Sheehy Alexandria, Inc.* (E.D.Va. 2002) 228 F.Supp.2d 711, 717 (*Rucker I*).)

In *Rucker I,* a federal district court addressed a situation factually on all fours with the present action. In that case, the plaintiff had engaged in a "spot delivery" transaction for a car, whereby she executed a retail installment sales contract, buyer's order, and bailment agreement on April 3, and took possession of the car. (*Rucker I, supra,* 228 F.Supp.2d at p. 713.) The buyer's order and bailment agreement made clear that the transaction was a spot delivery, because the sale was contingent upon receiving financing within five days of the agreement. (*Ibid.*) The dealer was able to secure financing only under different terms, and the plaintiff returned to the dealership on April 13, to sign a second agreement that incorporated the new terms. (*Id.* at pp. 713–714.) The court found that the transaction was consummated, in accordance with the TILA and Regulation Z, "not when the consumer [took] possession of the product, but at the 'time that [the] consumer [became] contractually obligated on a credit transaction . . .' [citations]." (228 F.Supp.2d at p. 716.) Based on the April 13 consummation date, the court concluded that the APR disclosed in the April 13 contract was inaccurate because it had been improperly calculated from April 3, the nominal date of the April 13 agreement. (*Id.* at pp. 716–717.) Using the improper accrual date of April 3 in the April 13 agreement violated the TILA because it led to a disclosed APR of 24.95

percent, whereas a properly calculated APR, using an accrual date of April 13, was 25.35 percent. (228 F.Supp.2d at p. 717.) The difference in the APR's was 0.4 percent, which was outside the 0.125 percent tolerance allowed by the TILA. (228 F.Supp.2d at p. 717.)

Although the *Rucker I* court noted that this seemed "to be no more than a minor technical error," it awarded statutory damages for the improper disclosure of the APR. (*Rucker I, supra*, 228 F.Supp.2d at p. 717.) The court stated that: "Even if consumers were aware of the sensitivity of the APR to changes in interest accrual dates, they would need to perform complex calculations to gauge the difference between the APR calculated on the nominal date of a backdated agreement versus the actual date of consummation. There is no reason for consumers to bear this burden. The implementing regulations simplify matters by prohibiting earlier accrual dates which would result in understated APRs. This renders the disclosures more comparable and helps to 'assure a meaningful disclosure' of the APR. [Citation.]" (*Id.* at p. 718.) The court stated that if the automobile dealer wanted "to recover payment from the consumer for the use of the car prior to the second agreement, it should explicitly provide for some rent to be paid for this time period in the original conditional contract." (*Id.* at p. 719, fn. omitted.)

The *Rucker I* court revisited its opinion on the automobile dealer's motions to amend the judgment or for relief from judgment. (*Rucker v. Sheehy Alexandria, Inc.* (E.D.Va. 2003) 244 F.Supp.2d 618, 620 (*Rucker II*).) In *Rucker II*, the court rejected the automobile dealer's argument that the use of April 3 in calculating the disclosed APR was proper because the parties agreed that April 3 was the effective date of the agreement, stating the argument simply could not "be squared with the requirements of Regulation Z." (*Id.* at p. 623.) The court emphasized that the inaccurately stated APR violated the TILA, not the backdating of the second contract. (244 F.Supp.2d at p. 626.)

## II. *The ASFA*

### A. *Liability*

#### 1. *The Statutory Scheme*

The California Legislature enacted the ASFA in 1961 with an operative date of January 1, 1962, to increase protection for the unsophisticated motor vehicle consumer and provide additional incentives to dealers to comply with the law. (Stats. 1961, ch. 1626, pp. 3534–3541; *Cerra v. Blackstone* (1985) 172 Cal.App.3d 604, 608 [218 Cal.Rptr. 15].) The ASFA serves to protect motor vehicle purchasers from abusive selling practices and

excessive charges by requiring full disclosure of all items of cost. (*Stasher v. Harger-Haldeman* (1962) 58 Cal.2d 23, 29 [22 Cal.Rptr. 657, 372 P.2d 649] (*Stasher*).) Under the ASFA, every conditional sale contract must contain "in a single document all of the agreements of the buyer and seller with respect to the total cost and the terms of payment for the motor vehicle, including any promissory notes or any other evidences of indebtedness." (§ 2981.9 [the single document rule].) Conditional sale contracts must also contain all disclosures and notices required under section 2982, in addition to the disclosures required by Regulation Z. (§ 2982.)

Subdivision (a) of section 2982 requires certain disclosures, which must be labeled " 'itemization of the amount financed,' " including, among other things, the cash price, the total cash price (which is the sum of other required disclosures), the amount of any insurance premiums included in the contract, the amount financed, and "[t]he amount of any administrative finance charge, labeled 'prepaid finance charge.' " (§ 2982, subd. (a)(1)(A) & (L), (3), (7) & (8).) "The disclosures required by subdivision (a) [of section 2982] may be itemized or subtotaled to a greater extent than as required by that subdivision and shall be made together and in the sequence set forth in that subdivision." (§ 2982.)

2. *Analysis*

a. *The Backdating Class*

The trial court found Pearson Ford not liable for a violation of the ASFA, stating that "although [Pearson Ford's] conduct constituted technical violations of Civil Code §§ 2981.9 [(the single document rule)], 2982, 2982(a), and 2982(a)(7), the [Contract] at issue was facially accurate and agreed to by the parties, and therefore, [Pearson Ford] substantially complied with [the ASFA]." Nelson contends the trial court erred when it found that Pearson Ford had substantially complied with the ASFA, and that Pearson Ford should be found liable to the backdating class under the ASFA. On cross-appeal, Pearson Ford asserts it fully complied with the ASFA as a matter of law, but even assuming it did not, it substantially complied. As we shall explain, we agree that Pearson Ford violated the disclosure requirements of subdivision (a) of section 2982, and the single document rule as to both classes. These violations rendered the second contract unenforceable under section 2983.

As a threshold matter, Nelson argues that Pearson Ford's violation of Regulation Z rendered the second contract unenforceable. While we agree that Pearson Ford violated Regulation Z, this violation does not render the contract unenforceable under the ASFA.

█ "Section 226.22(a) of Regulation Z provides that the annual percentage rate for other than open end credit transactions shall be determined in

accordance with either the actuarial method or the United States Rule method." (12 C.F.R. § 226, appen. J(A)(1) (2010).) "The term of the transaction begins on the date of its consummation . . . ." (12 C.F.R. § 226, appen. J(B)(2) (2010).) "Consummation means the time that a consumer becomes contractually obligated on a credit transaction." (12 C.F.R. § 226.2(a)(13) (2010); see Veh. Code, § 5901, subd. (d) ["A sale is deemed completed and consummated when the purchaser of the vehicle has paid the purchase price, or, in lieu thereof, has signed a purchase contract or security agreement, and has taken physical possession or delivery of the vehicle."].)

Thus, Regulation Z requires that the APR be calculated from the date the consumer becomes obligated, not the date the consumer makes the downpayment and drives the car away. (*Rucker I, supra*, 228 F.Supp.2d at p. 717.) Additionally, Regulation Z mandates that the disclosed APR be accurate to within 0.125 percent of the properly calculated APR. (12 C.F.R. § 226.22(a)(2) (2010).) The first unlettered paragraph of section 2982 incorporates Regulation Z into the ASFA, stating: "A conditional sale contract subject to this chapter shall contain the disclosures required by Regulation Z, whether or not Regulation Z applies to the transaction."

Here, Pearson Ford used the actuarial method to improperly calculate the APR from the day Nelson took possession of the car. Using the improper consummation date of October 2, the second contract listed the APR as 21 percent; use of the correct consummation date of October 8 results in an APR of 21.23 percent. The 0.23 percent difference exceeded the 0.125 percent tolerance allowed by Regulation Z. (15 U.S.C. § 1606(c); 12 C.F.R. § 226.22(a)(2) (2010).) Thus, Pearson Ford failed to comply with Regulation Z.

■ Pearson Ford's violation of Regulation Z, however, does not render the second contract unenforceable. The Legislature added a reference to Regulation Z to section 2982 in 1981 (Stats. 1981, ch. 1075, § 14, p. 4125, operative Oct. 1, 1982), to bring the ASFA and several other statutes into conformity with federal disclosure requirements. (Historical and Statutory Notes, 9B West's Ann. Civ. Code (2009 ed.) foll. § 1803.2, p. 200.) The Legislature simultaneously amended sections 2983 and 2983.1, but failed to specify that a failure to comply with Regulation Z would also render the contract unenforceable. (Stats. 1981, ch. 1075, §§ 18, 19, pp. 4132–4133, operative Oct. 1, 1982.) Under section 2983, only violations of section 2981.9, or subdivisions (a), (j), or (k) of section 2982, make the contract unenforceable. The language of these statutes is clear that only the violation of *specific* disclosure requirements renders the contract unenforceable.

While Nelson questions the wisdom of requiring compliance with Regulation Z, but not affording a remedy to the consumer when a dealer fails to

comply, we cannot say that the failure to afford a remedy resulted from a legislative oversight. Rather, it appears that the failure to provide a remedy for a violation of Regulation Z was deliberate. In any event, as we shall discuss, Pearson Ford violated section 2981.9 and subdivision (a) of section 2982, which do provide a remedy.

■ Nelson argues that Pearson Ford violated the disclosure requirements of subdivision (a) of section 2982 because it failed to separately itemize the $19.53 in preconsummation interest in the second contract, and this violation rendered the second contract unenforceable. He admits, however, that preconsummation interest is not listed as a required disclosure in the "itemization of the amount financed" set forth in subdivision (a) of section 2982. Nonetheless, relying on *Thompson v. 10,000 RV Sales, Inc.* (2005) 130 Cal.App.4th 950 [31 Cal.Rptr.3d 18] (*Thompson*), he contends preconsummation interest is an illegal charge and that Pearson Ford cannot escape liability because the contract does not contain a separate line for it to disclose this illegal charge. We agree.

In *Thompson*, the trial court found violations of the ASFA, the UCL, and the CLRA, and issued a permanent injunction against a dealer prohibiting it from including overallowances on trade-in vehicles in the cash price of the vehicles it sold. (*Thompson, supra*, 130 Cal.App.4th at p. 963.) An overallowance is " ' "the difference in the amount owed and the actual cash value of a trade-in vehicle." ' " (*Lewis v. Robinson Ford Sales, Inc.* (2007) 156 Cal.App.4th 359, 362 [67 Cal.Rptr.3d 347].) The buyer in *Thompson* owed more on the traded-in vehicle than what the vehicle was worth, resulting in negative equity in the sales transaction. (*Thompson, supra,* at p. 977.) In *Thompson* we addressed the narrow issue of the propriety of the permanent injunction. (*Ibid.*) We agreed that the dealer had violated the ASFA by incorrectly disclosing the cash price of the vehicle, the value of the traded-in vehicle, and the total downpayment as required by subdivision (a)(1)(A), (6)(C) and (G) of section 2982, respectively. (*Thompson, supra,* at pp. 972, 978–979.)

Significantly, the contract in *Thompson* contained all the disclosures required by subdivision (a) of section 2982. Nonetheless, we concluded that the contract violated the ASFA because the dealer had manipulated the numbers that the ASFA required it to disclose in a manner that hid negative equity and deceived the consumer. (*Thompson, supra,* 130 Cal.App.4th at pp. 973, 977 & 979, fn. 21.) In doing so, we rejected the dealer's argument that the contract did not have a line entitled "over-allowance" on which it could disclose the amount. We concluded that "creating an over-allowance by artificially inflating the true value of a trade-in vehicle to eliminate negative equity solely to obtain financing results in an unlawful credit practice under the ASFA." (*Id.* at

p. 979, fn. 21.) We noted that the disclosure requirements of the ASFA protect against *"inaccurate* and unfair credit practices." (130 Cal.App.4th at p. 979, original italics.)

█ Similarly here, the second contract contained all the disclosures required by subdivision (a) of section 2982, including the amount financed. (§ 2982, subd. (a)(8).) However, Pearson Ford's act of backdating the second contract resulted in Nelson paying a finance charge before consummation of the contract. (See Regulation Z; Veh. Code, § 5901, subd. (d).) Accordingly, the backdating of the second contract caused Nelson to pay interest on a contract that did not exist. We consider this preconsummation interest to be an illegal finance charge.

Nelson's consent to the backdating of the second contract does not protect Pearson Ford because it hid from Nelson the costs associated with backdating the second contract. While it may have been logical for Pearson Ford to backdate the contract because Nelson used the car for six days before consummating the transaction, there were other methods it could use in the event an original contract is voided due to the failure to obtain financing. (See, e.g., *Rucker I, supra,* 228 F.Supp.2d at p. 719 & fn. 15 [original contract can include a rental fee if financing falls through].) Pearson Ford's violation of subdivision (a) of section 2982 rendered the contract unenforceable under section 2983.

To avoid this result, Pearson Ford asserts the trial court properly applied the doctrine of substantial compliance, citing the trial court's statement that "on its face everything is disclosed and everything is right on. . . . [T]he problem is that the contract was backdated." Nelson claims the court erroneously applied the substantial compliance doctrine because the ASFA is a mandatory statutory scheme that excuses computation errors and allows the correction of certain violations. (§§ 2983 [excusing "accidental or bona fide" computational errors], 2984 [allowing for correction of violations appearing on the face of the contract within certain time periods].)

█ As described by the California Supreme Court in 1962, substantial compliance "means *actual* compliance in respect to the substance essential to every reasonable objective of the statute. But when there is such actual compliance as to all matters of substance then mere technical imperfections of form or variations in mode of expression by the seller, or such minima as obvious typographical errors, should not be given the stature of noncompliance and thereby transformed into a windfall for an unscrupulous and designing buyer." (*Stasher, supra,* 58 Cal.2d at p. 29, original italics.)

Assuming without deciding that the concept of substantial compliance continues to apply to violations of the ASFA, we cannot conclude that

Pearson Ford substantially complied with the ASFA by hiding an illegal charge in the second contract. This act did not constitute a technical defect of form, nor can we say the act complied with reasonable objectives of the statute, which is to provide protection for the unsophisticated motor vehicle consumer. (*Cerra v. Blackstone, supra,* 172 Cal.App.3d at p. 608.)

The single document rule requires that "all of the agreements of the buyer and seller with respect to the total cost and the terms of payment for the motor vehicle" be contained in a single document. (§ 2981.9.) Here, the parties executed two contracts dated October 2; however, one must review the Acknowledgement to determine the operative contract and discover that Pearson Ford falsely dated the second contract. Without the Acknowledgement, anyone reviewing the original contract and the second contract had no means of determining (1) the operative contract; (2) the date the parties consummated the transaction, and thus, the correct APR; or (3) that Nelson improperly paid a finance charge when no contract existed.

Pearson Ford admits that a third party needed to review the Acknowledgment to discover the inaccuracy in the second contract, but asserts this is irrelevant because the parties knew they signed the second contract on October 8, even though they dated it October 2. While it is true the parties agreed to backdate the second contract, it does not necessarily follow that Nelson knew the impact the contract date had in determining the APR, or that Pearson Ford charged him interest for the six days that no contract existed. (*Rucker I, supra,* 228 F.Supp.2d at p. 718.) The only way to determine the date the parties consummated the transaction, the correct APR, and that Nelson improperly paid a finance charge when no contract existed is to review the three documents and perform some calculations. Accordingly, the second contract violated the single document rule because it did not contain "all of the agreements of the buyer and seller with respect to the total cost and the terms of payment for the motor vehicle . . . ." (§ 2981.9.) Pearson Ford's violation of the single document rule rendered the contract unenforceable under section 2983.

██ We reject Pearson Ford's contention that the second contract did not violate the single document rule because it contained all of the agreements with respect to the total cost and terms of payment. This argument ignores that the consummation date is the beginning date to incur a finance charge, and an essential fact in calculating an accurate APR. As the *Rucker I* court noted: "Once the backdated contract is signed, there is no evidence on the face of the controlling legal documents that the terms of the deal which the consumer signed actually changed after [the consumer] took possession of the car. . . . [T]he potential for abuse is obvious in transactions involving a spot delivery and backdating of a [retail installment contract]." (*Rucker I, supra,*

228 F.Supp.2d at p. 719.) We also reject Pearson Ford's assertion that it complied with the letter and spirit of the single document rule because the second contract contained all the required information. Unless dealers disclose correct information the disclosure itself is meaningless and the informational purpose of the ASFA is not served.

Nelson next argues that Pearson Ford violated subdivision (j)(2) of section 2982 requiring that, except under certain circumstances not applicable to the instant transaction, "[t]he holder of the contract may not charge, collect, or receive a finance charge that exceeds the disclosed finance charge . . . ." Here, however, Pearson Ford disclosed a specific dollar amount as the finance charge in the contract, and Nelson presented no evidence that Pearson Ford charged, collected or received a finance charge *greater* than the dollar amount actually disclosed. Accordingly, Pearson Ford did not violate subdivision (j)(2) of section 2982.

Finally, Pearson Ford contends the record does not support the trial court's conclusion that the second contract violated subdivision (a)(7) of section 2982. We agree. Subdivision (a)(7) of section 2982 required Pearson Ford to itemize "[t]he amount of any administrative finance charge . . . labeled 'prepaid finance charge.' " Although the ASFA does not define a "prepaid finance charge," Regulation Z defines the term as "any finance charge paid separately in cash or by check before or at consummation of a transaction, or withheld from the proceeds of the credit at any time." (12 C.F.R. § 226.2(a)(23) (2010).) Nelson does not address this issue in his appellate briefs, impliedly conceding that he did not separately pay any finance charge by cash or by check before or at consummation of the transaction, or that Pearson Ford withheld a finance charge from the proceeds of Nelson's credit. (See, e.g., *California School Employees Assn. v. Santee School Dist.* (1982) 129 Cal.App.3d 785, 787 [182 Cal.Rptr. 1].)

In summary, based on Pearson Ford's violation of section 2981.9, and subdivision (a) of section 2982, we reverse the trial court's conclusion that Pearson Ford is not liable to the backdating class under the ASFA, and remand the matter to the trial court to determine an appropriate statutory remedy under the ASFA. The parties have not briefed the allowable remedies for the backdating class under the ASFA; however, our discussion of the appropriate ASFA remedy for the insurance class provides the trial court and the parties with some guidance on this issue. (See, *post*, pt. II.B.)

b. *The Insurance Class*

Subdivision (a)(3) of section 2982 requires sellers to disclose the cost of insurance on a separate line in the contract. Although Nelson purchased

insurance from Pearson Ford, this cost is not listed anywhere in the second contract. Rather, the parties executed a separate document, the Due Bill, acknowledging the insurance purchase and lumping the insurance premium into the cash price of the car. The trial court determined that Pearson Ford's failure to disclose the cost of insurance violated subdivision (a)(3) of section 2982 and the single document rule (§ 2981.9), and that Pearson Ford had not substantially complied with the ASFA by adding the cost of insurance to the cash price of the car.

Pearson Ford admits that it added the cost of insurance to the price of the car, that the insurance premium should have been separately listed in the second contract, and that Nelson erroneously paid $30 in additional sales tax and financing charges on the insurance premium. Nonetheless, Pearson Ford asserts it "substantially complied" with the informational purpose of the ASFA as a matter of law because (1) not separately itemizing the insurance premium in the second contract was a technical violation and (2) the Due Bill provided Nelson with all the information he needed to be fully aware that he had purchased insurance for a $250 premium.

Again, assuming without deciding that the concept of substantial compliance continues to apply to violations of the ASFA, we conclude the trial court correctly determined there was no substantial compliance. The failure to separately itemize the cost of insurance in the second contract is not a mere technical imperfection because this error caused Nelson to pay additional sales tax and financing charges. This is not a situation where the dealer simply placed the cost item on an improper line in the contract. We reject Pearson Ford's argument that it substantially complied with subdivision (a)(3) of section 2982 because Nelson had access to the additional document which contained the information he needed to evaluate the purchase. This argument subverts the informational purpose of the ASFA, and the purpose behind the single document rule. Moreover, review of the Due Bill and second contract did not inform Nelson that he would be paying sales tax and financing charges on the insurance. While it could be argued that some consumers would realize the implications of adding the insurance premium to the cash price of the car, the ASFA was designed to protect less sophisticated consumers.

Pearson Ford argues that the single document rule does not preclude using multiple documents for matters relating to insurance because insurance is not part of the "total cost and the terms of payment for the motor vehicle . . . ." (§ 2981.9.) While it may be true that the price of insurance generally does not impact the total cost of a vehicle, Pearson Ford's act of adding the insurance premium to the cash price of the car unquestionably impacted the total cost of the car because it increased the sales tax and financing charges. Accordingly,

as the trial court correctly found, Pearson Ford violated section 2981.9 by placing the parties' agreements regarding insurance in a separate document.

Finally, to avoid liability to the insurance class under the ASFA, Pearson Ford argues that *if* the monetary award to the insurance class under the ASFA is correct, then, as a matter of law, the one-year statute of limitations for actions on a statute imposing a forfeiture barred Nelson's ASFA claims. (Code Civ. Proc., § 340, subd. (a).) This contingent argument is moot based on our conclusion that the trial court imposed an improper remedy for Pearson Ford's violations of the ASFA as to the insurance class. (See, *post*, pt. II.B.)

## B. *ASFA Remedies*

The trial court concluded that Pearson Ford's practices toward the insurance class violated the ASFA and the UCL. Citing both statutory schemes, the trial court allowed all members of the insurance class to recover from Pearson Ford "the total amount paid by them, pursuant to their [contracts], to Defendant Pearson Ford and/or its assignees as of the date of this Judgment [(Oct. 24, 2008)], in an aggregate amount not to exceed $145,535.91." (Pearson Ford represents that this figure was not directly related to insurance premiums or sales tax on the premiums. It was the aggregate of the entire amount that the nine members of the insurance class should have paid under the terms of their contracts from the date they bought their cars to the judgment date of Oct. 24, 2008.) The trial court also gave all members of the insurance class "the option, upon submission of a claim and according to proof, and subject to application of the equitable powers and considerations of the Court, to elect to retain their vehicle and continue with their [contract] in force or to rescind the contract and cancel all further obligations under the [contract] and return the vehicle to Defendant Pearson Ford. Defendant Pearson Ford's additional liability for rescission to the members of [the insurance class] shall not exceed an aggregate amount of $101,578.29." (Pearson Ford represents that this was the aggregate of the monthly payments that the nine members of the insurance class *still* owed under their contracts from Oct. 24, 2008, until their final payments were due.)

Pearson Ford asserts on appeal that the trial court erred in the remedy awarded to the insurance class because the ASFA does not allow the insurance class members to obtain return of all money paid if they elect to continue their contracts. Pearson Ford also contends the trial court erred by not providing it with an appropriate offset for use of the vehicles by those insurance class members that elected to rescind their contracts and return their vehicles. Nelson responds the trial court did not err because where contracts are found to be unenforceable, buyers are allowed to recover from sellers everything they paid under their contracts (§ 2983), and keep their vehicles (§ 2983.1).

 Our analysis begins with an overview of the case law interpreting the former version of section 2982 in force before the Legislature enacted the ASFA in 1961. Because the Legislature is presumed to be aware of existing laws and judicial decisions and to have enacted or amended statutes in light of this knowledge (*People v. Overstreet* (1986) 42 Cal.3d 891, 897 [231 Cal.Rptr. 213, 726 P.2d 1288]), this case law explains the changes made by the Legislature in 1961. We then turn to the statutes themselves. Where the language of a statute is susceptible to more than one reasonable construction, we review the legislative history of the measure to ascertain its meaning. (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1055 [80 Cal.Rptr.2d 828, 968 P.2d 539].) Statutory interpretation presents a question of law subject to de novo review on appeal. (*Bialo v. Western Mutual Ins. Co.* (2002) 95 Cal.App.4th 68, 76–77 [115 Cal.Rptr.2d 3].)

In *General Motors Acceptance Corp. v. Kyle* (1960) 54 Cal.2d 101 [4 Cal.Rptr. 496, 351 P.2d 768] (*General Motors*), the California Supreme Court determined the rights of the parties to a conditional sale contract that violated former section 2982, subdivision (a) because it failed to itemize and describe the fees paid by the dealer to public officials, and was not signed by an authorized representative of the dealer. (*General Motors, supra*, at p. 106.) The Supreme Court remarked that subdivisions (a) and (b) of former section 2982, which were "designed to enable the buyer to know just what his contract is," had been termed "formal" requirements. (54 Cal.2d at pp. 108–109.) It observed that subdivisions (c) and (d) of former section 2982, which were "directly aimed at excessive charges which are akin to usury," had been termed "substantive" requirements. (*General Motors, supra*, at pp. 108–109.)

The *General Motors* court noted that former section 2982 did not specify the effect of violation of the formal requirements. (*General Motors, supra*, 54 Cal.2d at p. 109.) In contrast, both the 1945 and 1949 versions of section 2982 provided sanctions for substantive violations, at subdivisions (c) and (e), respectively. (*General Motors, supra*, 54 Cal.2d at p. 109 & fn. 3.) Namely, such contracts shall be unenforceable " 'except by a purchaser for value, and the buyer *may* recover from the seller in a civil action' "—" 'three times the total amount paid on the contract balance' " (the 1945 version) or " 'the total amount paid on the contract balance by the buyer to the seller' " (the 1949 version). (*Ibid.*, italics added.) The court observed that, despite the lack of specified sanctions for formal violations and the express sanctions for substantive violations, for either violation the buyer could "invoke the restitutive measure of recovery and obtain the total amount or value of that with which he parted, including down payments, *less offsets* hereinafter described." (*Id.* at p. 111, italics added.)

The *General Motors* court then explained that a seller guilty of substantive violations was not entitled to an offset, but that a seller guilty of formal violations could obtain "an offset 'in an amount representing the depreciation in value of the car occasioned by the use made of it by the buyer while in his possession, which necessarily excludes any allowance for depreciation resulting from a general decline in the market value of such automobile during the period in question.' " (*General Motors, supra*, 54 Cal.2d at p. 111, quoting *Williams v. Caruso Enterprises* (1956) 140 Cal.App.2d Supp. 973, 980 [295 P.2d 592] (*Williams*).) In adopting the measure of offset enunciated in *Williams*, the *General Motors* court stated that "the seller can in no event recover on the theory of offset more than an amount equal to that which the buyer is entitled to recover . . . ." (*General Motors, supra*, at p. 111.) It also rejected several other measures of offset suggested by the lower courts, such as (1) the rental value of the car; (2) the reasonable value of use of a conditionally sold car; and (3) where a trade-in is part of the purchase, the "difference between rental value of the conditionally sold vehicle and the automobile traded in." (*Id.* at p. 111 & fn. 8.)

After the Supreme Court decided *General Motors*, the Assembly Interim Committee on Finance and Insurance published its report on former section 2982 in 1961. (Assem. Interim Com. on Finance and Ins., Final Rep., 15 Assem. Interim Com. Reps. (1961) No. 24, 1 Appen. to Assem. J. (1961 Reg. Sess.) (the Report).) The Report reiterated many of the observations made by the *General Motors* court, namely (1) even though former section 2982, subdivision (e) pertained only to substantive violations, courts have applied the subdivision to formal violations; and (2) sellers guilty of formal violations were allowed the offset described in *Williams*, but sellers guilty of substantive violations could not obtain an offset. (The Report, *supra*, at pp. 31–32.)

The Report noted that "[d]espite this judicial surgery" the law remained inadequate and ambiguous. (The Report, *supra,* at p. 32.) The Report observed that dealers infrequently committed substantive violations where an offset was not allowed; however, dealers continued to commit formal violations where they could obtain an offset. (*Ibid.*) The drafters of the Report speculated that dealers continued to commit formal violations knowing (1) they could obtain an offset; (2) trial courts would need to interpret the offset described in *Williams*; and (3) "the mere existence of the case law granting the offset will lead many lawyers to advise their clients in the first place that to file suit will be a risky and uncertain venture at best." (The Report, *supra*, at p. 33.) The drafters of the Report heard testimony from an attorney that dealers have ready access to experts willing to testify that a vehicle loses value the minute it is driven off a dealer's lot. (*Id.* at pp. 32–33.) The attorney opined that if an offset is allowed, "it should not include the drop in value caused by that car leaving the sales floor and becoming a used car." (*Id.* at p. 34.)

■ The Legislature subsequently enacted the ASFA, which added sections 2983 and 2983.1. (Stats. 1961, ch. 1626, § 4, pp. 3534, 3537–3538, eff. Jan. 1, 1962.) Section 2983 is similar to former section 2982, subdivision (e). (*General Motors, supra,* 54 Cal.2d at p. 109, fn. 3.) It provides that when a seller violates subdivision (a) of section 2982 and there is no showing of an accidental or bona fide error in computation, "the conditional sale contract *shall not be enforceable,* except by a bona fide purchaser, assignee or pledgee for value or until after the violation is corrected as provided in Section 2984, and if the violation is not corrected the buyer *may* recover from the seller the total amount paid, pursuant to the terms of the contract, by the buyer to the seller or his assignee." (Stats. 1961, ch. 1626, § 4, pp. 3534, 3537, eff. Jan. 1, 1962, italics added.)

In turn, paragraph 4 of section 2983.1 sets forth the buyer's choice of remedies if a contract is unenforceable under section 2983: "When a conditional sale contract is not enforceable under Section 2983 or 2983.1, the buyer may elect to retain the motor vehicle and continue the contract in force or may, with reasonable diligence, elect to rescind the contract and return the motor vehicle. The value of the motor vehicle so returned shall be credited as restitution by the buyer *without any decrease which results from the passage of time* in the cash price of the motor vehicle as such price appears on the conditional sale contract." (Stats. 1961, ch. 1626, § 4, pp. 3534, 3538, eff. Jan. 1, 1962, italics added.) The first paragraph of section 2983.1 is similar to former section 2982, subdivision (f), but the option to retain the vehicle and continue the contract in force, or rescind the contract and return the vehicle appears for the first time in the ASFA. (Compare Stats. 1949, ch. 1594, § 1 pp. 2842, 2843–2844 with Stats. 1961, ch. 1626, § 4, pp. 3534, 3538, eff. Jan. 1, 1962.) Although the Legislature subsequently amended sections 2983 and 2983.1, the above cited language did not change. (Stats. 1967, ch. 815, § 1, p. 2239; Stats. 1979, ch. 805, §§ 23, 24, p. 2794; Stats. 1981, ch. 1075, §§ 18, 19, pp. 4132–4133, operative Oct. 1, 1982.)

With this background, we address Pearson Ford's contentions. First, Pearson Ford asserts the ASFA does not allow the insurance class members to obtain return of all money paid, even if they elect to continue their contracts, essentially giving the insurance class members a free vehicle. Pearson Ford contends that section 2983 must be read along with section 2983.1. Thus, when the Legislature stated, "the buyer *may* recover from the seller the total amount paid, pursuant to the terms of the contract," the buyer can recover its payments only if he or she elects to rescind the contract. (§ 2983, italics added.) Nelson disputes this interpretation, claiming it renders section 2983 meaningless. We conclude that Pearson Ford has the better argument.

First, the *General Motors* court disapproved that portion of *Williams* suggesting that buyers could retain their vehicles and also recover the sums

paid for purchase of the vehicle. (*General Motors, supra*, 54 Cal.2d at pp. 112–113, quoting *Williams, supra*, 140 Cal.App.2d at p. Supp. 979.) The *General Motors* court stated that "buyer[s] cannot both recover the consideration with which [they] parted and keep the vehicle; [they] cannot simultaneously avoid the conditional sale contract and assert rights in the conditionally sold car." (*General Motors, supra*, at p. 112.)

Second, as we already noted, section 2983 is similar to former section 2982, subdivision (e), both stating that where a violation renders a contract unenforceable "the buyer may recover from the seller" the total amount paid on the contract. (§ 2983; *General Motors, supra*, 54 Cal.2d at p. 109, fn. 3.) The Court of Appeal in *Katsaros v. O. E. Saugstad Co.* (1961) 197 Cal.App.2d 745 [17 Cal.Rptr. 453] (*Katsaros*) interpreted former section 2982, subdivision (e), concluding that the vehicle must be returned as a condition of recovery of all payments made, noting that the "object of the statute is to protect the buyer, not to provide him with a windfall." (*Katsaros*, at p. 749.) The *Katsaros* court cited the Report as support for its conclusion. (*Ibid.*)

Thus, it appears the Legislature created the rescission option in section 2983.1 to codify the legal principles discussed by the *General Motors* and *Katsaros* courts. Notably, these legal principles track the Civil Code, which requires a party seeking rescission to "[r]estore to the other party everything of value which he has received from him under the contract or offer to restore the same upon condition that the other party do likewise, unless the latter is unable or positively refuses to do so." (§ 1691, subd. (b).)

It also appears the Legislature intended sections 2983 and 2983.1 to be read together. Section 2983 states that "the buyer *may* recover from the seller the total amount paid, pursuant to the terms of the contract" (§ 2983, italics added), not that the buyer "shall" recover. Section 2983.1 then describes the circumstances under which buyers "may" recover what they paid, i.e., when they elect to rescind their contracts and return their vehicles. The last sentence of section 2983.1 allows buyers to obtain restitution for their returned vehicles. The restitution award could allow buyers to recover from sellers the total amount they paid under their contracts, or a lesser amount.

Nelson's interpretation of sections 2983 and 2983.1 ignores the restitution provision in section 2983.1. Nelson appears to advocate that buyers electing to rescind their contracts could recover from sellers everything they paid under their contracts, return their vehicles, *and* obtain restitution from the sellers for the value of the returned vehicles. This surely results in a windfall to buyers. Nothing in the legislative history of the ASFA or the prior case law supports this interpretation.

In summary, we conclude the trial court erred to the extent it found that the ASFA allowed the insurance class members to recover from Pearson Ford what they paid under their contracts, and keep their vehicles.

We next turn to the portion of section 2983.1 that allows buyers rescinding their contracts and returning their vehicles to obtain restitution for the value of the returned vehicles "without any decrease which results from the passage of time in the cash price of the motor vehicle as such price appears on the conditional sale contract." (§ 2983.1, 4th par.) Pearson Ford asserts the trial court erred by not providing an offset for the buyer's use of any returned vehicles. Nelson does not address the offset issue. We discuss Pearson Ford's contention to provide guidance to the trial court on remand.

 As a threshold matter, the clear language of section 2983.1 allows consumers to obtain restitution when they rescind their contracts and return their vehicles, but disallows an offset resulting from the passage of time. Accordingly, section 2983.1 begs the question whether the Legislature intended to disallow *any* offset for the buyer's use of the vehicle. Had the Legislature intended to disallow any offset, it could have eliminated the passage of time language and simply stated: "The value of the motor vehicle so returned shall be credited as restitution in full by the buyer." The Legislature did not do so; rather, it carefully proscribed an offset resulting from the passage of time.

This harks back to the variety of offsets discussed in *General Motors.* Namely, the Supreme Court in *General Motors* allowed a seller's offset " 'in an amount representing the depreciation in value of the car occasioned *by the use made of it by the buyer while in his possession,* which necessarily *excludes* any allowance for depreciation resulting from a general decline in the market value of such automobile during the period in question,' [citation]." (*General Motors, supra,* 54 Cal.2d at p. 111, italics added, quoting *Williams, supra,* 140 Cal.App.2d at p. Supp. 980.) Thus, it appears the Legislature adopted the offset approved by our high court in *General Motors.* By not allowing an offset for the passage of time, the Legislature was trying to avoid situations where a new vehicle loses value when it is driven off the dealer's lot and immediately becomes a used vehicle. (The Report, *supra,* at p. 34.) In the almost 50 years that section 2983.1 has been in existence, there are no published cases addressing the offset.

We also adopt the offset for the buyer's use of the vehicle. Accordingly, on remand those class members electing to rescind their contracts and return their vehicles are entitled to restitution. The restitution amount must not be decreased for depreciation resulting from a general decline in the market value of their vehicles resulting from the passage of time. The restitution

amount, however, may be decreased for depreciation in the value of the vehicles occasioned by the buyers' use of the vehicles. Any seller's offset of this nature may not exceed the amount which the buyers are entitled to recover under their contracts.

We believe the court has broad discretion to consider the equities when setting the offset amount, if any. For example, a buyer might return to a dealer a few days after purchasing a car based on a violation of the ASFA, but the dealer refuses to remedy the situation forcing the buyer to sue. While the action is pending, the buyer has no choice but to use the car. If the buyer prevails and opts to return the vehicle, the dealer's unwillingness to address the violation should be considered in setting any offset for the buyer's use of the vehicle. Discretion in setting the offset amount encourages buyers to immediately return to the dealer when a violation of the ASFA is suspected, and encourages dealers to quickly remedy any ASFA violations.

## III. *The UCL*

Pearson Ford argues that Nelson lacked standing to sue under the UCL, but assuming he had standing the trial court erred in the remedies it awarded. Nelson also contends the trial court erred in the remedies it awarded. We reject Pearson Ford's argument that Nelson lacked standing, and separately address the parties' respective appeals regarding the remedies awarded by the trial court under the UCL.

### A. *Liability*

The UCL defines "unlawful competition" to include an "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ." (Bus. & Prof. Code, § 17200.) "By proscribing 'any unlawful' business practice, '[Business & Professions Code] section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527].) After the 2004 amendment of the UCL by Proposition 64, a private person has standing to sue only if he or she " 'has suffered injury in fact and has lost money or property *as a result of* [such] unfair competition.' " (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 306 [93 Cal.Rptr.3d 559, 207 P.3d 20], italics added (*Tobacco II*), quoting Bus. & Prof. Code, § 17204.) In the context of a class action, only the class representatives must meet Proposition 64's standing requirements of actual injury and causation. (*Tobacco II, supra,* at pp. 315–316.)

The actual payment of money by a plaintiff, as wrongfully required by a defendant, "constitute[s] an 'injury in fact' for purposes of Business and Professions Code section 17204. [Citations.]" (*Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1347 [90 Cal.Rptr.3d 589] (*Troyk*).) Causation for UCL standing purposes is satisfied if "a causal connection [exists] between the harm suffered and the unlawful business activity." (*Daro v. Superior Court* (2007) 151 Cal.App.4th 1079, 1099 [61 Cal.Rptr.3d 716] (*Daro*); accord, *Troyk, supra*, at p. 1349.) However, "[t]hat causal connection is broken when a complaining party would suffer the same harm whether or not a defendant complied with the law." (*Daro, supra*, at p. 1099.)

For example, in *Troyk*, an insured filed a class action against his automobile insurer alleging the insurer violated the UCL by requiring him to pay a service charge for payment of his automobile insurance policy premium and, because the service charge was not stated in his policy, the insurer violated Insurance Code section 381, subdivision (f), requiring that this be done. (*Troyk, supra*, 171 Cal.App.4th at p. 1314.) Although the *Troyk* court found that the insurer had violated the Insurance Code as alleged (*id.*, at p. 1334), it concluded that causation under the UCL did not exist because the plaintiff did not show that had the insurer disclosed the monthly service charges in the policy documents as required by the Insurance Code, he would not have paid them. (171 Cal.App.4th at p. 1350.) Significantly, the lack of disclosure of *proper* charges, not illegal charges, violated the UCL in *Troyk*.

Here, the trial court impliedly found that Pearson Ford had violated the UCL as to both classes through its violations of the ASFA, and we have affirmed that Pearson Ford is liable for its violations of the ASFA. (See, *ante*, pt. II.A.2.) Pearson Ford does not challenge the conclusion that its violations of the ASFA support Nelson's UCL claims; rather its appeal is limited to the trial court's finding that Nelson had standing to pursue claims under the UCL. Pearson Ford focuses its argument on whether Nelson suffered injury "as a result of" its unfair competition under the UCL. (Bus. & Prof. Code, § 17204.) Relying on *Troyk*, Pearson Ford contends that Nelson needed to prove he would not have bought the car if he had known that the second contract (1) charged him preconsummation interest; (2) misstated the APR; and (3) failed to separately itemize the $250 insurance premium. We disagree.

The failure of Pearson Ford to comply with the ASFA caused Nelson to suffer an injury and lose money as to both classes because he paid preconsummation interest (the backdating class), and paid sales tax and financing charges on the insurance premium (the insurance class). Unlike *Troyk*, these illegal charges violated the UCL and Pearson Ford improperly collected additional funds from Nelson. UCL causation exists because Nelson would *not* have paid preconsummation interest, or sales tax and financing charges on

the insurance premium had Pearson Ford complied with the ASFA. Because Nelson had standing to pursue claims under the UCL, we reject Pearson Ford's argument that the judgment in favor of both classes should be vacated to the extent it grants relief under the UCL.

## B. *UCL Remedies*

### 1. *General Legal Principles*

 The focus of the UCL is "on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices." (*Tobacco II, supra*, 46 Cal.4th at p. 312.) The remedies available under the UCL are limited to injunctive, restitutionary and related relief (Bus. & Prof. Code, § 17203; *State of California v. Altus Finance* (2005) 36 Cal.4th 1284, 1303 [32 Cal.Rptr.3d 498, 116 P.3d 1175]), and are "cumulative . . . to the remedies or penalties available under all other laws of this state" (Bus. & Prof. Code, § 17205). However, restitutionary or injunctive relief is not mandatory; rather, equitable considerations may guide the court's discretion in fashioning a remedy for a UCL violation. (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 180 [96 Cal.Rptr.2d 518, 999 P.2d 706] (*Cortez*).)

Under the UCL, a trial court has broad equitable power to award restitution after considering "the equities on both sides of a dispute." (*Cortez, supra*, 23 Cal.4th at p. 180.) However, "[a] court cannot, under the equitable powers of [Business and Professions Code] section 17203, award whatever form of monetary relief it believes might deter unfair practices." (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1148 [131 Cal.Rptr.2d 29, 63 P.3d 937] (*Korea Supply*).) The "object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." (*Id.* at p. 1149.) Additionally, "disgorgement of money obtained through an unfair business practice is an available remedy in a representative action only to the extent that it constitutes restitution." (*Id.* at p. 1145.) "While it may be that an order of restitution will also serve to deter future improper conduct, in the absence of a measurable loss [Business and Professions Code section 17203] does not allow the imposition of a monetary sanction merely to achieve this deterrent effect." (*Day v. AT & T Corp.* (1998) 63 Cal.App.4th 325, 339 [74 Cal.Rptr.2d 55].)

The trial court also has broad power under the UCL to "enjoin on-going wrongful business conduct in whatever context such activity might occur." (*Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 111 [101 Cal.Rptr. 745, 496 P.2d 817], fn. omitted; see Bus. & Prof. Code, § 17203.) To obtain injunctive relief, the plaintiff must show that the wrongful conduct alleged in

the complaint is ongoing or likely to recur. (*Madrid v. Perot Systems Corp.* (2005) 130 Cal.App.4th 440, 464–466 [30 Cal.Rptr.3d 210].) The trial court's decision on the propriety of granting injunctive relief is reviewed for abuse of discretion. (*Salazar v. Eastin* (1995). 9 Cal.4th 836, 850 [39 Cal.Rptr.2d 21, 890 P.2d 43].)

2. *Nelson's Appeal Regarding Restitutionary Remedies to the Backdating Class*

Based on its conclusion that Pearson Ford is liable under the UCL for engaging in an unlawful business practice, the trial court awarded each member of the backdating class restitution in the amount of $50. Nelson appeals, arguing the trial court erroneously ignored or arbitrarily threw out the parties' stipulation to use statistical sampling to calculate restitution under the UCL, and awarded an approximate midpoint between the stipulated amount ($63.14) and what Pearson Ford argued for ($43.40). Pearson Ford asserts that it agreed to the sampling methodology, but did not agree to be bound by the resulting number. We agree with Pearson Ford.

The parties initially agreed in principle that the amount of restitution paid to each class member would be determined through statistical sampling. The court took a recess to allow the parties to consult with an expert regarding the appropriate sample size. The parties agreed that Nelson's expert would review a randomly selected sample of 176 contracts, and that defense counsel would review the resulting spreadsheet. Before the hearing adjourned, Nelson's counsel expressed his hope that defense counsel would stipulate to the number calculated by his expert. The trial court agreed that a stipulation would be preferable.

At the next hearing, Nelson's counsel represented that his expert calculated the preconsummation interest and the finance charge for the preconsummation interest (interest on interest) charged for the sampled contracts, and calculated an average of $43.40 for preconsummation interest, and an average finance charge incurred on that amount of $19.75, resulting in total restitution of about $63.14 for each class member. Defense counsel informed the court that the parties disputed whether a finance charge over the life of the loan should be allowed in the recovery because it was unknown whether every class member paid off his or her loan over the life of the loan. After hearing argument on this issue, the court stated: "Would it be beyond the realm of possibility to end this by stipulating or agreeing to $50? Make a determination arbitrarily—maybe not arbitrarily, but by using some common sense that probably have [*sic*] the people paid the loan off when it was due. Interest plus finance charge. I mean, it's interpolated anyway. Why not just make it $50? That's what I'm going to do."

Nelson claims the restitution amount should be increased to $63.14, and Pearson Ford claims the amount should be lowered to $43.40. We reject both contentions as neither party has shown the trial court abused its discretion in awarding $50. The record clearly shows that the parties agreed to a methodology to determine the restitutionary amount, with Pearson Ford tacitly agreeing with the calculated average of $43.40 for preconsummation interest. The parties, however, never stipulated that the restitutionary award would include a finance charge for the preconsummation interest.

As defense counsel explained to the court, the representative sampling determined an average duration for the preconsummation interest period, but no analysis was done to determine an amortization period for the finance charge. When the court inquired whether it would be reasonable to assume that "half" the people paid off their loans, defense counsel stated he did not know whether that was a reasonable assumption. The court believed it was a reasonable assumption, and essentially divided in half the calculated average finance charge of $19.75, added this to $43.40 and rounded the figure to $50. The parties have provided no reasoned argument explaining how the trial court abused its discretion under the circumstances.

■ We disagree with Nelson's assertion that this issue is rendered moot based on our conclusion that the trial court erred in finding Pearson Ford substantially complied with the ASFA as to the backdating class. Remedies available under the UCL are cumulative to the remedies available under all other laws of this state. (Bus. & Prof. Code, § 17205.) "Therefore, the fact that there are alternative remedies under a specific statute does not preclude a UCL remedy, unless the statute itself provides that the remedy is to be exclusive." (*State of California v. Altus Finance, supra*, 36 Cal.4th at p. 1303.) Here, nothing in the ASFA indicates that its remedies are exclusive; accordingly, the trial court had the authority to order restitution under the UCL in conjunction with any remedies under the ASFA.

3. *Pearson Ford's Appeal Regarding Restitutionary Remedies to the Insurance Class*

Citing the ASFA and the UCL, the trial court awarded the members of the insurance class all the money they had paid for their vehicles as of the date of the judgment. The trial court also gave the class members the option to retain their vehicles and continue their contracts in force, or to rescind their contracts and return their vehicles to Pearson Ford.

Pearson Ford appeals claiming the trial court erred by awarding Nelson all the money he had paid for his car, and allowing him to keep the car, owing only the monthly payments that came due after judgment was entered. It

contends that the award was not restitutionary, and thus improper under the UCL. Nelson does not address the propriety of this remedy to the insurance class under the UCL.

 "Rescission is an equitable remedy." (*Gill v. Rich* (2005) 128 Cal.App.4th 1254, 1264 [28 Cal.Rptr.3d 52].) Its purpose is to restore both parties to their former position as far as possible. (*Gardiner Solder Co. v. SupAlloy Corp., Inc.* (1991) 232 Cal.App.3d 1537, 1544 [284 Cal.Rptr. 206].) Restitution may refer to the disgorging of something which has been taken or compensation for injury done. (*People ex rel. Kennedy v. Beaumont Investment, Ltd.* (2003) 111 Cal.App.4th 102, 134 [3 Cal.Rptr.3d 429].) In a UCL action, restitution generally compels a defendant to return money obtained through an unfair business practice. (*People ex rel. Kennedy*, at p. 134.) Rescission and restitution are distinct remedies. (*Gardiner Solder Co. v. SupAlloy Corp., Inc., supra*, 232 Cal.App.3d at p. 1544.) While rescission may be followed by restitution in an appropriate contract action (§ 1692), rescission is not a necessary predicate to granting restitution in a statutory action under the UCL. (*People ex rel. Kennedy v. Beaumont Investment, Ltd., supra*, 111 Cal.App.4th at pp. 132–133.) We have found no authority supporting the remedy of rescission in a UCL action. Thus, to the extent the trial court used the UCL as a basis to support its order giving the insurance class members the option to retain their vehicle, or rescind their contracts and return their vehicles, the judgment is reversed.

The trial court also erred in its restitution order. Pearson Ford's unfair practice of adding the insurance premium to the price of the purchased vehicle resulted in the class members erroneously paying sales tax on the insurance premiums. At trial, the court heard evidence that the sales tax charged on the $250 insurance premium increased the cost of Nelson's car by about $30. The insurance premium went to the insurance broker, the sales tax went to the state, and the finance charge on the sales tax went to the lender. Based on this evidence, the trial court awarded the members of the insurance class all the money they had paid for their vehicles as of the date of the judgment. This is not appropriate restitutionary relief under the UCL as it does not accomplish the statutory objective of restoring to the victims sums acquired through Pearson Ford's unfair practices. (*Korea Supply, supra*, 29 Cal.4th at p. 1149.) Accordingly, to the extent the trial court used the UCL as a basis to award the members of the insurance class all the money they had paid for their vehicles as of the date of the judgment, the judgment is reversed. The matter is remanded to the trial court to consider an appropriate remedy to the insurance class under the UCL. We express no opinion on what type of restitution order is appropriate, and leave the matter to the sound discretion of the trial court.

### 4. *Nelson's Appeal Regarding Distribution of Unpaid Residuals*

Code of Civil Procedure section 384 provides guidelines for courts to use in shaping class remedies. Subdivision (b) of this statute declares that unless the defendant is a public entity or public employee, "prior to the entry of any judgment in a class action . . . the court shall determine the total amount that will be payable to all class members, if all class members are paid the amount to which they are entitled pursuant to the judgment. The court shall also set a date when the parties shall report to the court the total amount that was actually paid to the class members. After the report is received, the court shall amend the judgment to direct the defendant to pay the sum of the unpaid residue, plus interest on that sum at the legal rate of interest from the date of entry of the initial judgment . . ." in any manner the court determines is consistent with the objectives and purposes of the underlying cause of action.

In subdivision (a) of Code of Civil Procedure section 384, the Legislature explains that its intent in enacting the statute was "to ensure that the unpaid residuals in class action litigation are distributed, to the extent possible, in a manner designed either to further the purposes of the underlying causes of action, or to promote justice for all Californians." The principles expressed in Code of Civil Procedure section 384 apply whenever there are unclaimed funds after a class action settlement or judgment. (*Cundiff v. Verizon California, Inc.* (2008) 167 Cal.App.4th 718, 731 [84 Cal.Rptr.3d 377] [refund checks not cashed or undeliverable after judgment ordering distribution on "claims made" basis].)

Here, the judgment states: "In the event that any escrow or other fund(s) are ordered to be established for the administration of claims, Pearson Ford Co. shall not forfeit any unclaimed amounts and any and all amounts remaining after the payment of all timely and valid claims *shall be returned to Pearson Ford Co. . . .*" (Italics added.) Although it is not clear whether the trial court intended this provision to apply to both classes, we interpret it that way.

Nelson challenges this portion of the judgment, claiming that Code of Civil Procedure section 384 applied and that the trial court erred in creating a reversionary interest for Pearson Ford in the remainder of the class recovery fund. Pearson Ford agrees that the trial court did not have the authority to require that unpaid residue from the insurance class revert to Pearson Ford because recovery to the insurance class was under both the ASFA and the UCL, and the ASFA has no provision giving the trial court the discretion to ignore Code of Civil Procedure section 384. It argues, however, that the trial court had the authority to disregard Code of Civil Procedure section 384 as to

the backdating class because recovery to this class was solely under the UCL. Pearson Ford contends that the court's broad equitable powers under the UCL allowed the court to treat the backdating class differently than Code of Civil Procedure section 384 required.

Assuming, without deciding, that the trial court has the discretion to ignore Code of Civil Procedure section 384 where class recovery is solely under the UCL, we reject Pearson Ford's argument based on our conclusion that the trial court erred when it found Pearson Ford not liable to the backdating class under the ASFA. (See, *ante,* pt. II.A.2.a.) Applying Pearson Ford's argument, since recovery to the backdating class was under both the ASFA and the UCL the court did not have the discretion to disregard Code of Civil Procedure section 384 as to the backdating class.

Accordingly, that portion of the judgment returning to Pearson Ford any sums remaining after the payment of all valid claims, is reversed. On remand the trial court is directed to comply with Code of Civil Procedure section 384 as to both classes.

5. *Pearson Ford's Appeal Regarding Injunctive Remedies for Both Classes*

For the backdating class, the trial court permanently enjoined Pearson Ford from calculating the APR for purposes of disclosure on a subsequent or second retail installment sale contract using an accrual date earlier than the "consummation date," meaning that time that the consumer becomes contractually obligated on the credit transaction. For the insurance class, the trial court permanently enjoined Pearson Ford "from adding the price of insurance to the cash price of the vehicle . . . ." The trial court "required and ordered" Pearson Ford to "[d]isclose the cost of insurance included in a Retail Installment Sale Contract" on a separate line in that section of the contract itemizing the amount financed.

Pearson Ford challenges the injunctions on the narrow ground that Nelson presented insufficient evidence for the court to conclude that a reasonable probability existed that it would repeat its unlawful conduct. We agree with Pearson Ford as to the insurance class, but conclude sufficient evidence supported the injunction as to the backdating class.

■ "An injunction cannot issue in a vacuum based on the proponents' fears about something that may happen in the future. It must be supported by actual evidence that there is a realistic prospect that the party enjoined intends to engage in the prohibited activity. [Citations.]" (*Korean Philadelphia Presbyterian Church v. California Presbytery* (2000) 77 Cal.App.4th 1069, 1084 [92 Cal.Rptr.2d 275].) As to the insurance class, defense counsel

represented that Pearson Ford consummated about 12,000 transactions during the five-year class period. Out of those transactions, about 300 customers financed their insurance premium. Out of the 300 transactions, 10 customers (3.33 percent) had the cost of the insurance improperly added to the cash price of the vehicle. Nelson did not dispute these representations at trial, or present any evidence showing Pearson Ford had a policy of adding insurance to the cash price of vehicles. Based on this record, the trial court could not have reasonably concluded that Pearson Ford had an ongoing practice of adding insurance to the cash price of vehicles. Additionally, Nelson did not address Pearson Ford's argument regarding the propriety of injunctive relief for the insurance class in his respondent's brief, effectively conceding the issue. Because substantial evidence does not support the trial court's implied finding that Pearson Ford's act of adding insurance to the cash price of vehicles is ongoing or likely to recur, we conclude the trial court abused its discretion by granting injunctive relief for the insurance class.

In contrast, Nelson presented evidence that Pearson Ford had a policy of backdating contracts, and that Pearson Ford purportedly changed its policy, and discontinued the practice in between the third quarter of 2005 and the fourth quarter of 2006. Defense counsel admitted, however, that after Pearson Ford changed its policy of backdating contracts, its employees backdated 228 contracts, 156 in 2006 and 72 in 2007. Based on this evidence, the trial court could reasonably conclude that despite Pearson Ford's purported change in policy, Pearson Ford continued to backdate contracts and improperly collect preconsummation interest. Accordingly, there was sufficient evidence of ongoing conduct to support the issuance of a permanent injunction for the backdating class.

## IV. *The CLRA*

### A. *Liability*

The Legislature enacted the CLRA in 1970 to provide individual consumers with a remedy against merchants employing certain deceptive practices in connection with the sale of goods or services, noting the difficultly consumers faced proving a fraud claim. (Assem. Com. on Judiciary, Questions & Answers regarding Assem. Bill No. 292 (1970 Reg. Sess.) May 18, 1970.) The purpose of the statutory scheme is "to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." (§ 1760.) The Legislature intended the CLRA to be "liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." (*Ibid.*) The CLRA sets forth 24 proscribed "unfair methods of competition and unfair or deceptive acts or practices." (§ 1770, subd. (a).)

Here, Nelson alleged that Pearson Ford violated six specific provisions of the CLRA. The trial court concluded that Pearson Ford did not violate the CLRA. Nelson argues the trial court erred when it found Pearson Ford not liable to either class under the CLRA because Pearson Ford's conduct violated subdivision (a)(14) of section 1770, which makes it illegal to "[r]epresent[] that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law." We reject Nelson's arguments as to the insurance class, but conclude the court erred as to the backdating class.

We start with the language of the statute to determine whether Nelson proved a violation of subdivision (a)(14) of section 1770. The transaction involved the sale of a vehicle and insurance for the vehicle. Accordingly, the question presented is whether Pearson Ford made any oral or written misrepresentations about any "rights, remedies, or obligations" included in the sale, that the sale did not have or involve, or which were prohibited by law. We note, however, that "although a claim may be stated under the CLRA in terms constituting fraudulent omissions, to be actionable the omission must be contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose." (*Daugherty v. American Honda Motor Co., Inc.* (2006) 144 Cal.App.4th 824, 835 [51 Cal.Rptr.3d 118] (*Daugherty*); see *Outboard Marine Corp. v. Superior Court* (1975) 52 Cal.App.3d 30, 36 [124 Cal.Rptr. 852] ["It is fundamental that every affirmative misrepresentation of fact works a concealment of the true fact."].) Under the CLRA, plaintiffs must show actual reliance on the misrepresentation and harm. (§ 1780, subd. (a); *Buckland v. Threshold Enterprises, Ltd.* (2007) 155 Cal.App.4th 798, 809–810 [66 Cal.Rptr.3d 543].)

Nelson claims the second contract was deceptive because it did not contain his agreement to purchase insurance. Accordingly, he asserts the trial court erred when it found Pearson Ford not liable under the CLRA to the insurance class. We disagree.

The second contract did not contain any representations regarding insurance; rather, it erroneously failed to reflect Nelson's agreement to purchase insurance. This omission, however, did not violate the CLRA because it was not contrary to a representation actually made by Pearson Ford. (*Daugherty, supra,* 144 Cal.App.4th at p. 835.) Moreover, the Due Bill, which was part of the transaction, correctly informed Nelson that he had purchased insurance. Additionally, Nelson testified that he knew he had purchased insurance; thus, he cannot show reliance on the purported misrepresentation. We reject Nelson's contention that Pearson Ford's violation of the ASFA for the insurance class resulted in a violation of the CLRA. Unlike the UCL, which

borrows violations of other laws and makes those unlawful practices actionable under the UCL (*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1505 [82 Cal.Rptr.2d 368]), the CLRA prohibits 24 acts sounding in fraud. (§ 1770, subd. (a)(1)–(24).) Accordingly, Pearson Ford's violation of the ASFA for the insurance class has no bearing on whether it also violated the CLRA.

As to the backdating class, Nelson claims the second contract (1) misrepresented his obligations to pay finance charges; and (2) included the representation that he was obligated to pay a finance charge effective October 2, that was prohibited by law. We agree the first act did not violate subdivision (a)(14) of section 1770, but conclude the second act did.

Nelson does not explain how the second contract misrepresented his obligation to pay finance charges; rather, the second contract accurately stated the finance changes he would incur based on the disclosed APR. Nelson testified in deposition that he understood the finance charges. Moreover, nothing prohibited Pearson Ford from adding finance charges to the transaction. Nonetheless, Pearson Ford violated the CLRA because the second contract represented it had a legal right to collect finance charges effective October 2, an obligation prohibited by Regulation Z. (See, *ante*, pt. II.A.2.a.) Nelson relied on the representation by paying finance charges effective October 2. Accordingly, Pearson Ford violated subdivision (a)(14) of section 1770 by misrepresenting an obligation that was prohibited by law.

In summary, the trial court correctly found Pearson Ford not liable to the insurance class under the CLRA, but erred when it found Pearson Ford not liable to the backdating class under the CLRA.

B. *The CLRA Remedies*

 Any consumer who suffers damage as a result of the use or employment by any person of a method, act or practice declared to be unlawful by section 1770 may bring an action against that person to recover actual damages, injunctive relief, restitution of property, punitive damages, and any other relief the court deems proper. (§ 1780, subd. (a).) Remedies under the CLRA are not exclusive, but are in addition to any other procedures or remedies. (§ 1752.) Restitution must be supported by the evidence and be consistent with the purpose of restoring to the plaintiff the amount that the defendant wrongfully acquired. (See *Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663, 694–700 & fn. 22 [38 Cal.Rptr.3d 36].) The award of actual damages in a class action must be at least $1,000 (§ 1780, subd. (a)(1)), and a prevailing plaintiff is entitled to an award of attorney fees and costs (§ 1780, subd. (e)).

Based on our conclusion that Pearson Ford is liable to the backdating class under the CLRA, this matter must be remanded to the trial court to consider

the appropriate remedy given the evidence presented by the parties. We express no opinion on what type of remedy is appropriate, and leave the matter to the sound discretion of the trial court.

## V. *Validity of Pearson Ford's Code of Civil Procedure Section 998 Offer*

After the trial court certified this matter as a class action, Pearson Ford served a Code of Civil Procedure section 998 offer on Nelson that read: "In exchange for dismissal of this action and mutual releases of all claims, subject to approval by the Court, . . . Pearson Ford agrees to pay the sum of five hundred thousand dollars ($500,000.00); and . . . Pearson Ford will agree to an injunction to the effect that it will not add insurance to the cash price of a vehicle . . . and will date any rewritten contract on the same date it is signed. [¶] This Offer to Compromise is inclusive of all claims for damages, costs and expenses, attorney fees and interest in this action and shall serve as full and final satisfaction of all claims for damages, costs and expenses, attorney fees and interest in this action." The offer was "subject to approval by the Court."

After the trial court entered the judgment, both parties moved for an award of attorney fees and costs. Nelson argued that he should receive attorney fees because both classes prevailed in their claims under the ASFA. (§ 2983.4.) Pearson Ford claimed it was the prevailing party under the ASFA as to the backdating class. Pearson Ford also argued that Nelson had failed to obtain a judgment more favorable than its Code of Civil Procedure section 998 offer thereby requiring Nelson to pay its costs from the time of the Code of Civil Procedure section 998 offer, and requiring that Nelson not recover the costs he incurred after the time of the Code of Civil Procedure section 998 offer. (Code Civ. Proc., § 998, subd. (c)(1).) In making this argument, Pearson Ford estimated Nelson's pre-Code of Civil Procedure section 998 offer costs at $178,405, and Nelson's total recovery in the action at $222,785.91, the sum of which ($401,190.91) is less favorable than its Code of Civil Procedure section 998 offer.

The trial court concluded that Nelson was the prevailing party for both classes under the ASFA, and awarded Nelson reasonable attorney fees and costs in the amounts of $389,563 and $11,795.60, respectively. The trial court also denied Pearson Ford's request to recover its attorney fees and costs under Code of Civil Procedure section 998 on the ground the lump-sum Code of Civil Procedure section 998 offer to settle both class claims and Nelson's individual claims was invalid.

Pearson Ford does not challenge the trial court's conclusion that Nelson was the prevailing party for both classes under the ASFA, nor does it

challenge the award amount. Instead, it argues that the trial court erred in finding the Code of Civil Procedure section 998 offer invalid. It asserts that if any part of the judgment survives our review, and assuming that the surviving judgment, excluding Nelson's postoffer attorney fees and costs, does not exceed $500,000, then the award of attorney fees and costs should be reversed and remanded for reconsideration to allow the trial court to determine whether the judgment exceeded Pearson Ford's Code of Civil Procedure section 998 offer.

As a threshold matter, we concluded that both classes were entitled to a judgment in their favor under the ASFA, and remanded the matter to the trial court to determine the appropriate remedy to both classes under the ASFA. (See, *ante*, pt. II.) On remand, the surviving judgment, excluding Nelson's postoffer attorney fees and costs, will likely exceed $500,000. Accordingly, Pearson Ford's contention regarding the validity of its Code of Civil Procedure section 998 offer is arguably moot. Nevertheless, in the event that the judgment on remand does not exceed $500,000, we address Pearson Ford's argument regarding the validity of its Code of Civil Procedure section 998 offer on its merits.

We shall assume, without deciding, the broad issue that valid settlement offers can be made under Code of Civil Procedure section 998 in a certified class action. Here, however, we agree with the trial court that the Code of Civil Procedure section 998 offer was invalid because it was a lump-sum offer to multiple classes, which are the equivalent of separate parties.

We review de novo the trial court's application of Code of Civil Procedure section 998 to the undisputed facts. (*Barella v. Exchange Bank* (2000) 84 Cal.App.4th 793, 797 [101 Cal.Rptr.2d 167].) We start with the well-established principle that, in general, a Code of Civil Procedure section 998 offer to multiple plaintiffs is only valid if it is expressly apportioned between them and not conditioned on acceptance by all of them. (*Meissner v. Paulson* (1989) 212 Cal.App.3d 785, 791 [260 Cal.Rptr. 826] (*Meissner*).) In *Meissner*, the court observed that a typical problem with unallocated settlement offers to multiple plaintiffs is the impossibility of determining whether any one plaintiff received a less favorable result at trial than he would have received under the offer. (*Meissner, supra*, 212 Cal.App.3d at p. 790; cf. *Randles v. Lowry* (1970) 4 Cal.App.3d 68, 74 [84 Cal.Rptr. 321].) The *Meissner* court concluded that an unallocated Code of Civil Procedure section 998 offer to multiple plaintiffs is void, even though it may be said, by analyzing the verdict in hindsight, that an individual plaintiff received a less favorable result than the plaintiff would have, had the plaintiff accepted the offer. (*Meissner, supra*, at p. 791.)

Similarly here, where a single class representative refuses a lump-sum Code of Civil Procedure section 998 offer to two classes, it will be impossible to determine whether either class received a less favorable result at trial than it would have received under the offer. We can discern no basis for concluding that separate classes are different from separate parties, and Pearson Ford has not explained how the reasoning of *Meissner* should not apply to separate classes.

Pearson Ford's reliance on *Peterson v. John Crane, Inc.* (2007) 154 Cal.App.4th 498 [65 Cal.Rptr.3d 185] (*Peterson*) and *People ex rel. Lockyer v. Fremont General Corp.* (2001) 89 Cal.App.4th 1260 [108 Cal.Rptr.2d 127] (*Fremont*) is misplaced. In *Peterson*, a widow sued the defendant individually, as her deceased husband's successor in interest, and as her deceased husband's legal heir, seeking to recover for her husband's alleged asbestos-related disease. (*Peterson, supra,* 154 Cal.App.4th at p. 501.) The *Peterson* court concluded there was only one plaintiff, despite the multiple roles she occupied in the litigation. (*Id.* at pp. 506–507.) The *Peterson* court noted that the offer did not need to be apportioned because the proposed settlement sum was zero and proposed a mutual waiver of costs. (*Id.* at p. 510, fn. 11.) Additionally, any finding regarding the liability of the defendant would resolve all claims regardless of what "hat" the plaintiff wore. Thus, there was no difficultly in determining which party obtained the more favorable result at trial. In *Fremont,* a lump-sum Code of Civil Procedure section 998 offer to a single plaintiff, the People, suing on behalf of both the government (for civil penalties) and individual consumers (for restitution) was valid, and any uncertainty about what to do with the money was not the type of uncertainty that invalidated the Code of Civil Procedure section 998 offer. (*Fremont, supra,* 89 Cal.App.4th at pp. 1268–1270.) Again, any liability finding would resolve all claims made by the government or the individual consumers. Because Pearson Ford made the offer jointly without allocation, it is impossible to say that any one class received a less favorable result than it would have under the offer of compromise.

## DISPOSITION

We reverse the judgment finding Pearson Ford not liable to the backdating class under the ASFA and the CLRA. We reverse the remedies awarded to the insurance class under the ASFA and the UCL, and the permanent injunction issued under the UCL as to the insurance class. We reverse the judgment returning to Pearson Ford any sums remaining after the payment of all valid claims. In all other aspects, the judgment is affirmed. The matter is remanded to determine, consistent with the views expressed in this opinion, appropriate

statutory remedies to (1) both classes under the ASFA; (2) the insurance class under the ASFA and the UCL; and (3) the backdating class under the CLRA. On remand the trial court is directed to comply with Code of Civil Procedure section 384 as to both classes. The parties are to bear their own appeal costs.

McConnell, P. J., and O'Rourke, J., concurred.