Filed 3/30/16  Rogers v. Automobile Club of Southern Calif. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JILL ROGERS, | B256085 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC494213) |
| v. | |
| AUTOMOBILE CLUB OF SOUTHERN CALIFORNIA et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jane L. Johnson, Judge.  Affirmed.

Blood Hurst & O'Reardon, Timothy G. Blood, Leslie E. Hurst; Consumer Watchdog, Harvey Rosenfield, Pamela Pressley, and Laura Antonini for Plaintiff and Appellant.

Sheppard Mullin Richter & Hampton, John T. Brooks and Jessica L. Mackaness for Defendants and Respondents.

_____

# INTRODUCTION

Jill Rogers sued Automobile Club of Southern California and Interinsurance Exchange of the Automobile Club (collectively, the Auto Club). She alleges that she was an Auto Club sales agent who sold automobile insurance on commission. Under the parties' contract, the amount of commission paid was based on numerous factors, including "Persistency with Prior Carrier." Based on the persistency factor, plaintiff received greater compensation for selling policies to customers who were insured by their prior carrier for at least six months.

Plaintiff alleges that the use of the persistency factor constitutes an unlawful and unfair business practice because it incentivizes sales agents to discriminate against previously uninsured consumers in violation of Proposition 103. Although plaintiff never engaged in such discriminatory practices and was paid fully under the negotiated terms of her contract, she claims that she has standing to sue the Auto Club under the Unfair Competition Law (UCL; Bus. & Prof. Code, § 17200) and for breach of contract and declaratory relief. She also claims that she is entitled to pursue a class action on behalf of other Auto Club sales agents, including those who—unlike herself—allegedly engaged in discriminatory practices that harmed previously uninsured consumers.

The trial court sustained the Auto Club's demurrer to plaintiff's first amended complaint. The court concluded that plaintiff lacked standing to bring the UCL claims, that she failed to allege a breach of contract, and that she could not seek declaratory relief premised on her flawed UCL and contract claims. Plaintiff appeals the final judgment subsequently entered in favor of the Auto Club. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**[1]

A.    THE FIRST AMENDED COMPLAINT

Plaintiff was an Auto Club sales agent from March 2008 through June 2011. As a sales agent, she sold automobile insurance for the Auto Club. For each sale, the Auto Club agreed to pay plaintiff a commission as set forth in the Pro Pay Compensation Plan (the Pro Pay Plan).

The Pro Pay Plan used a point system, as part of a scorecard, to calculate the amount of commission earned for each new policy sold. The points were based on seven factors, labeled: (1) Non-Chargeable Incidents; (2) Associated Policies; (3) Number of Vehicles on Policy; (4) Key Membership Longevity & Level; (5) Persistency with Prior Carrier; (6) Bodily Injury Limits; and (7) Payment Plan. One of the most significant factors was a purchaser's persistency with his or her prior automobile carrier: 35 points were awarded for a policy purchased by a customer who had a prior carrier for at least six months; and zero points were awarded for "[a]ll [o]thers."[2]

After totaling all the points, the new policy was placed into one of three business classes defined by a range of points: Class A—95 plus points; Class B—65 to 90 points; or Class C—60 points or less. Because of the high point value associated with the persistency factor, a person without prior automobile insurance would almost always purchase a Class C policy, making the lack of prior insurance the determinative factor in the classification. "After the [b]usiness [c]lass of a policy is determined, [the] Auto Club applies a second analysis to allocate points for a new policy sale. Under the second step, points are allocated based on [b]usiness [c]lass and the coverage purchased (e.g., property damage limits, medical payments limits, excess medical payments limits, uninsured

---

[1]    In describing the factual background, we assume the truth of the properly pleaded factual allegations in the first amended complaint. (*Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1100.)

[2]    The only factor worth more points was for a policyholder with three or more insured vehicles who did not have any at-fault accidents within the previous three years. Forty points were awarded in that instance.

3

collision).  More points are allocated for higher [b]usiness [c]lass policies and higher coverage limits."

Once the total points for a policy have been calculated, the Auto Club converts the points into commission dollars.  The conversion is done by multiplying the number of points for each policy sold by a sales agent's dollar rate, which ranges from $0.91 to $2.06 per point depending on the agent's sales record.  The persistency factor is important in this calculation, as shown by an example.  An agent with an average sales record who sold a Class A policy with high coverage limits would receive $140.14 in commissions, while that same agent who sold the same policy to a policyholder without prior insurance coverage would receive $34.49 because the policy would be classified as a Class C policy.

The Auto Club's commission plan is based on the Auto Club's assessment of the profitability of the policy sold, as reflected in the factors considered in awarding points for each sale.  "Commissions earned by [agents] are calculated based on the profitability characteristics or value of the policy sold, so that policies that generate greater retention and favorable loss results or profits for the Auto Club—such as policies that bring in higher dollar-value premiums or carry a lower risk of payout costs for the Auto Club—result in higher commission."

According to plaintiff, the Pro Pay Plan's incentive structure results in discrimination against previously uninsured consumers because sales agents earn less commission by selling to them.  Because of this structure, sales agents have devised tactics to avoid selling to the uninsured so that they can focus their time and attention on more profitable consumers.  These tactics include: hanging up on consumers who disclose that they are uninsured, making them wait long periods before assisting them, and fabricating high quotes to discourage them.  The Auto Club is aware of these tactics and has done nothing to stop them.

Although other sales agents engaged in these discriminatory practices, plaintiff does not allege that she did so.  She claims that she frequently sold policies to previously uninsured customers, and that she was injured as a result.  By selling to these customers,

4

plaintiff was paid less because the Auto Club used the persistency factor to reduce her commissions. She alleges that the Auto Club should not have relied on this factor because it is illegal under Insurance Code section 1861.02, subdivision (c) (section 1861.02(c)) to discriminate against previously uninsured drivers. The Auto Club never informed her about this law.

Based on these allegations, plaintiff asserts four causes of action: (1) a claim under the UCL for engaging in unlawful business practices; (2) a claim under the UCL for engaging in unfair business practices; (3) a claim for breach of contract for using an illegal contract term to deprive plaintiff of "the full amount of commissions [she] earned"; and (4) a claim for declaratory relief to resolve the dispute over the legality of the Auto Club's commission plan. Plaintiff seeks damages, restitution, an injunction, and attorneys' fees and costs.

## B. THE AUTO CLUB'S DEMURRER

The Auto Club demurred to the first amended complaint on the grounds that plaintiff lacked standing to assert the UCL and declaratory relief claims, and that she failed to state a claim for breach of contract. The trial court sustained the demurrer without leave to amend as to the UCL and declaratory relief causes of action, and with leave to amend as to her breach of contract cause of action.

In rejecting the UCL claims, the trial court explained: "Plaintiff's theory of liability rests on the allegation that some agents have engaged in conduct that turned away uninsured applicants, an alleged violation of . . . section 1861.02. However, [p]laintiff concedes she never turned away uninsured applicants, and, while she was paid a commission for her sales to uninsured applicants, it was at a lower rate. Absent a vested or contract right to higher commissions, [p]laintiff cannot allege[] an economic injury in fact 'as a result of' the alleged wrongful conduct." Plaintiff has no right to higher commissions by virtue of section 1861.02(c), because that statute "does not concern sales agents['] commissions." Rather, section 1861.02(c) protects consumers, not sales agents, from certain discriminatory insurance practices. The trial court found that the declaratory relief claim failed for similar reasons.

5

As for the breach of contract claim, the trial court reasoned that "[p]laintiff concedes that the Pro Pay Plan determines her compensation and does not dispute that she was paid in accordance with the plan." This concession defeats her claim because "no commissions other than those paid were 'earned' by [p]laintiff pursuant to the contract." The court is not free to sever the allegedly illegal term of the contract to increase plaintiff's compensation, as this would result in "a fundamental restructuring of the contract."

Because the first amended complaint was plaintiff's first attempt to state a cause of action for breach of contract, the trial court granted her leave to amend as to that cause of action. She did not file a second amended complaint, and the trial court entered judgment in favor of the Auto Club.

## DISCUSSION

A demurrer tests the legal sufficiency of the facts alleged in a complaint to determine whether they state a viable cause of action. (*Chapman v. Skype Inc.* (2013) 220 Cal.App.4th 217, 225.) In considering a demurrer, a court must read the complaint as a whole and accept as true all properly pleaded allegations. (*Ibid*.) Our review of a trial court's order sustaining a demurrer is de novo, while our review of a denial of leave to amend is for abuse of discretion. (*Ibid*.) Such discretion is abused if there is "a reasonable probability" that a plaintiff can cure the defect by amendment. (*Id*. at p. 226.) Applying this standard of review, we find that the trial court correctly sustained the demurrer to the first amended complaint.

### A. PROPOSITION 103: THE VOTER INITIATIVE AT ISSUE IN THIS CASE

Before analyzing the viability of plaintiff's claims, a brief overview of Proposition 103, the voter initiative upon which she relies in attacking the Auto Club's commission plan, is warranted.

The voters approved Proposition 103 in 1988 "to protect consumers from arbitrary insurance rates and practices, to encourage a competitive insurance marketplace, to provide for an accountable insurance commissioner and to ensure that insurance is fair, available, and affordable for all Californians. [Citations.]" (*Foundation for Taxpayer &*

6

*Consumer Rights v. Garamendi* (2005) 132 Cal.App.4th 1354, 1359.) To that end, Proposition 103 requires insurers to determine insurability, rates, and premiums based on specified rating factors. (*Donabedian v. Mercury Ins. Co.* (2004) 116 Cal.App.4th 968, 972.)

In implementing Proposition 103, the California Legislature enacted section 1861.02. Subdivision (a) of section 1861.02 requires automobile insurers to set rates and premiums based on four factors, including: the insured's driving safety record; the insured's annual miles driven; the insured's number of years of driving experience; and other factors that the insurance commissioner may adopt related to the risk of loss. Subdivision (b) of section 1861.02 requires insurers to provider a good driver discount to any driver who meets certain statutory requirements. Subdivision (c) of section 1861.02 provides: "The absence of prior automobile insurance coverage, in and of itself, shall not be a criterion for determining eligibility for a Good Driver Discount policy, or generally for automobile rates, premiums, or insurability. However, notwithstanding subdivision (a), an insurer may use persistency of automobile insurance coverage with the insurer, an affiliate, or another insurer as an optional rating factor."

Although section 1861.02 appears to regulate the underwriting of insurance policies for the benefit of consumers, plaintiff is not claiming that the Auto Club violated Proposition 103 by relying on discriminatory rating criteria in setting premiums for previously uninsured drivers. Instead, she argues that the commission plan for the Auto Club's agents has a discriminatory impact on previously uninsured drivers because it causes agents to avoid selling to this class of consumers, thereby violating section 1861.02(c). We need not and do not decide whether Proposition 103 extends to protect consumers against such indirect discriminatory impacts because plaintiff does not have standing to bring a UCL cause of action even if we assume that Proposition 103 reaches that far.[3]

---

[3]    For similar reasons, we do not decide whether the Pro Pay Plan would violate section 1861.02(c) if that law were to permit a discriminatory impact claim. Nor do we

7

**B.     PLAINTIFF CANNOT STATE A VIABLE CAUSE OF ACTION**

Plaintiff is not able to state a claim under the UCL because she lacks standing. She cannot state a breach of contract claim because there was no breach. And she cannot state a claim for declaratory relief because it is premised on her nonviable UCL and breach of contract claims.

1.     *The UCL Causes of Action*

The UCL prohibits business practices that are "unlawful," "unfair," or "fraudulent." (Bus. & Prof. Code, § 17200; accord, *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180.) To prosecute a UCL claim, a private party must have standing to do so. (Bus. & Prof. Code, § 17204; accord, *Sarun v. Dignity Health* (2014) 232 Cal.App.4th 1159, 1166.) This requires the plaintiff to show: (1) she suffered "economic injury"; and (2) the injury was "caused by" the unlawful, unfair, or fraudulent business practice. (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 322, italics omitted.)

Plaintiff asserts that she suffered economic injury because she did not receive the amount of commissions "she would have received absent the alleged unlawful and unfair provision in the Pro Pay Plan." This assertion, however, ignores a critical fact: plaintiff was paid what she was owed under her negotiated agreement with the Auto Club. Having received the benefit of the bargain, plaintiff cannot claim she has been economically harmed. (*Peterson v. Cellco Partnership* (2008) 164 Cal.App.4th 1583, 1591.) In *Peterson*, Verizon Wireless, acting as a sales agent, sold cell phone insurance to the plaintiffs without a license to do so. When the plaintiffs claimed that Verizon Wireless was liable under the UCL for collecting an illegal commission from these sales, the court concluded that the plaintiffs had not shown that they suffered economic injury, reasoning: The "plaintiffs here do not allege they paid more for the insurance due to [the]

---

decide whether plaintiff has standing to pursue a UCL claim for an alleged violation of a law that was enacted for the benefit of a consumer class to which she does not belong, or whether she can represent a class of sales agents who purportedly participated in an illegal scheme to harm the protected class of consumers.

8

defendant's collecting a commission.  They do not allege they could have bought the same insurance for a lower price either directly from the insurer or from a licensed agent.  Absent such an allegation, [the] plaintiffs have not shown they suffered actual economic injury.  Rather, they received the benefit of their bargain, having obtained the bargained for insurance at the bargained for price." (*Ibid*.; see also *Hall v. Time Inc.* (2008) 158 Cal.App.4th 847, 855 [consumer who received the benefit of his bargain did not sustain the economic injury required to bring a UCL claim].)

Plaintiff is in the same position as the plaintiffs in *Peterson* and *Hall*.  She entered into a contract; she agreed to receive a commission as provided by that contract; and she received the commission that she earned under the contract.  This is the very definition of receiving the benefit of the bargain.  Plaintiff tries to escape this conclusion by stating that she would have earned more money had the commission calculation in the contract not been partially based on the persistency factor.  She claims that the Auto Club would have increased her compensation by adding 35 points to all policies sold—including less profitable policies sold to previously uninsured consumers—if it could not consider persistency as a factor.  That is, the Auto Club simply would have increased the commissions for these less profitable policies by 75 percent, according to plaintiff.

This claim contradicts the allegations in plaintiff's first amended complaint.  Plaintiff alleges that the Auto Club created a commission structure "based on the profitability characteristics or value of the policy sold."  Plaintiff further alleges that policies sold to previously uninsured consumers are substantially less profitable.  In light of these allegations, plaintiff's conclusion that the Auto Club would have disregarded profitability considerations in crafting a new commission plan without the persistency factor is economically nonsensical—and one we need not accept.  (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 924 ["For purposes of reviewing a demurrer, we accept the truth of material facts properly pleaded in the operative complaint, but not contentions, deductions, or conclusions of fact or law"].)  The Pro Pay Plan contained a complex formula consisting of numerous economic factors designed to achieve the Auto Club's economic goals.  In that context, it is rank speculation at best to

9

suggest that the Auto Club would have undercut its own economic interests by paying its agents higher commissions for less profitable policies rather than reconfiguring the entire payment plan to avoid the additional commission costs. Such self-serving speculation is insufficient to confer standing. (*Schwartz v. Provident Life & Accident Ins. Co.* (2013) 216 Cal.App.4th 607, 613 [rejecting, as speculative, the plaintiffs' theory that the insurers' illegal handling of other parties' disability claims reduced the value of their insurance policies].)[4]

In support of her position, plaintiff cites several cases. But none involved a claim, as here, that a party sustained economic injury after receiving the benefit of the bargain. In *Nelson v. Pearson Ford Co.* (2010) 186 Cal.App.4th 983, 1014-1015, the defendant, an automobile dealer, engaged in unlawful business practices, such as backdating the contract and erroneously adding the insurance premium to the car's sales price, which caused the plaintiff to pay the defendant illegal fees and costs. In *Law Offices of Mathew Higbee v. Expungement Assistance Services* (2013) 214 Cal.App.4th 544, 556, the defendant's unauthorized practice of law forced the plaintiff to reduce its attorneys' fees and increase its advertising costs to compete with the defendant. In *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 168, the defendant unlawfully withheld wages that the plaintiff had earned. The showing of harm in these cases serves only to highlight the weakness of plaintiff's claim of injury here.

2. *The Breach of Contract Cause of Action*

Plaintiff's breach of contract claim fares no better. Once again she asserts, in support of her claim, that she "is entitled to be paid the commissions she earned on policy

---

[4]     The speculative nature of plaintiff's claim exposes another, related flaw in her standing argument—namely, her inability to show, as required under the second part of the standing analysis, that the use of the persistency factor caused her economic injury. Because the commission formula was the product of negotiation, she cannot demonstrate that she would have struck a better bargain that would have allowed her to earn more commissions for the same sales if the Auto Club had not been permitted to rely on the persistency factor.

10

sales to people without prior insurance pursuant to the terms of the Pro Pay Plan absent the illegal provision . . . ."  Plaintiff has no such entitlement.

To prove a claim of breach of contract, a plaintiff must prove that the defendant breached a contract causing the plaintiff to sustain damage.  (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.)  Here, plaintiff concedes that the Auto Club did not breach their agreement, plainly stating:  Plaintiff's "claim for breach of contract is not based on [the] Auto Club's failure to perform the contract as written."  Though this concession would seem to destroy her claim, plaintiff believes that she can overcome this elementary obstacle by invoking the severability doctrine.  That is, she argues that the court can sever the persistency factor as an illegal and unenforceable term and enforce the rest by increasing her commission beyond the terms of the actual agreement.

The severability doctrine does not work that way.  Under this doctrine, "[w]here a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest." (Civ. Code, § 1599.)  The purpose of the doctrine is two-fold: (1) "to prevent parties from gaining undeserved benefit or suffering undeserved detriment as a result of voiding the entire agreement—particularly when there has been full or partial performance of the contract"; and (2) "to conserve a contractual relationship if to do so would not be condoning an illegal scheme." (*Armendariz v. Foundation Health Psychcare Services, Inc*. (2000) 24 Cal.4th 83, 123-124.)  Here, plaintiff seeks to use the doctrine in a manner that undermines its twin purposes.  Even though the contract was fully performed, and even though plaintiff was paid in accordance with the terms of the contract, plaintiff contends that the doctrine of severability allows her to receive more than was agreed upon by the contracting parties.  If this were so, the doctrine could be used as a tool to gain an undeserved benefit, inflict an undeserved detriment, and disrupt the contractual relationship.  The severability doctrine is not such a tool.

None of the cases cited by plaintiff suggests otherwise.  (*Marathon Entertainment, Inc. v. Blasi* (2008) 42 Cal.4th 974, 997 [finding genuine issue of material fact about whether a personal services contract was severable when some services may have been

11

lawfully performed and others unlawfully performed]; *Benjamin, Weill & Mazer v. Kors* (2011) 195 Cal.App.4th 40, 59 [severing a provision in the arbitration clause that "was unintended and indeed unknown to the parties . . . would not impose on either of them any undeserved benefit or detriment" and enforcing "the remainder of the clause . . . achieves the paramount purpose of their contractual relationship"]; *Homestead Supplies, Inc. v. Executive Life Ins. Co.* (1978) 81 Cal.App.3d 978, 984-985 [finding that a technical violation of law in a contract did not render the contract unenforceable].)

In short, the severability doctrine does not relieve a party of its obligation to prove a breach of contract in a breach of contract case. Nor is it a doctrine that empowers courts to take contracts that were fully performed as the parties intended and rewrite them to favor one party over the other. As the California Supreme Court has emphasized, courts "do not rewrite any provision of any contract . . . for any purpose." (*Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 960, 968.)

3.        *The Declaratory Relief Cause of Action*

In her declaratory relief cause of action, plaintiff asks for a declaration about the parties' "rights and obligations" with respect to the "Auto Club's illegal commission scheme." The underlying bases for this cause of action are the alleged UCL violations and breach of contract claims. Consequently, the declaratory relief cause of action fails for the same reasons.

Plaintiff contends that she may pursue declaratory relief even if her UCL claims fail because the economic standing requirement for those claims do not apply to a declaratory relief cause of action. However, a declaratory relief claim requires an "actual controversy relating to the legal rights and duties of the respective parties." (Code Civ. Proc., § 1060.) In deciding if there is an actual controversy, we examine the rights and duties being asserted by the plaintiff. (*Linda Vista Village San Diego Homeowners Assn., Inc. v. Tecolote Investors, LLC* (2015) 234 Cal.App.4th 166, 181-182.)

Here, plaintiff asserts that she has the right to receive, and the Auto Club has an obligation to pay, more commissions under the Pro Pay Plan. This assertion is based on two theories—an alleged violation of the UCL and an alleged breach of contract. We

12

have concluded, however, that plaintiff has no right to recover higher commissions under either theory alleged in the complaint. Accordingly, there is no actual controversy over the legal rights and duties of the parties that remains to be addressed. (*County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 606 [declaratory relief claim requires actual controversy between the parties before the court].)

## **DISPOSITION**

The judgment is affirmed. The Auto Club is to recover its costs on appeal.


BLUMENFELD, J.[*]


We concur:


PERLUSS, P. J.


SEGAL, J.

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.